**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**LOIS JEAN REED,**

      **Plaintiff,**

**v.**                               **Case No. 3:13-cv-4647**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

## MEMORANDUM OPINION

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-33. The case is presently before the Court on the parties' motions for judgment on the pleadings. (ECF Nos. 13, 14). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 7, 8). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court **FINDS** that the decision of the Commissioner is based upon an incorrect application of the law, and therefore should be **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

## I.  Procedural History

Plaintiff Lois Jean Reed ("Claimant") filed for DIB on August 4, 2010, alleging a disability onset date of March 23, 2009, (Tr. at 140), due to osteoarthritis, hypertension,

depression, fibromyalgia, COPD, and hypothyroidism. (Tr. at 163). Claimant subsequently amended her disability onset date to July 20, 2009, consistent with the date she ceased substantial gainful activity. (Tr. at 41, 170). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 77-81, 83-85). Claimant filed a request for a hearing, (Tr. at 91), which was held on September 14, 2011 before the Honorable Harold J. Barkley, III, Administrative Law Judge ("ALJ"). (Tr. at 34-73). By written decision dated September 23, 2011, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 21-33). The ALJ's decision became the final decision of the Commissioner on January 2, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

On March 8, 2013, Claimant filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the proceedings on May 20, 2013. (ECF Nos. 9, 10). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 13, 14). Accordingly, this matter is ready for disposition.

## II.   **Claimant's Background**

Claimant was 50 years old on the amended date of disability onset, and 51 on the date last insured. (Tr. at 31, 140, 170). She has a GED and communicates in English. (Tr. at 38). Claimant has prior work experience as a nursing home care provider and a hair stylist/beautician. (Tr. at 164).

## III.   **Summary of ALJ's Findings**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520(a)(4). First, the ALJ determines whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). Second, if the claimant is not gainfully employed, then the inquiry is whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). Third, if the claimant suffers from a severe impairment, the ALJ determines whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does meet or equal a listed impairment, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). In the fourth step, the ALJ ascertains whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability and the burden shifts to the Commissioner to prove the final step. *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). Under the fifth and final inquiry, the Commissioner must demonstrate that the claimant is able to perform other forms of substantial gainful

activity, while taking into account the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through September 30, 2010. (Tr. at 23, Finding No. 1). The ALJ acknowledged that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since July 20, 2009, through her date last insured. (*Id.*, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of "fibromyalgia, degenerative joint disease in knees, osteoarthritis, and chronic obstructive pulmonary disease (COPD)." (Tr. at 23-25, Finding No. 3). The remainder of Claimant's alleged impairments, including "gastroesophageal reflux disease, small hiatal hernia, hypertension/headaches secondary to hypertension, hypothyroidism, hypocholesterolemia, obesity with a body mass index of 37.03, degenerative disc disease of the spine, and depression," were found to be nonsevere. (Tr. at 23-25). Under the third inquiry, the ALJ concluded that Claimant's impairments, either individually or in combination, did not meet or medically equal any of the listed impairments. (Tr. at 25, Finding No. 4). Consequently, the ALJ determined that, through the date last insured, Claimant had the RFC to:

> [P]erform light work as defined in 20 CFR 404.1567(b) except able to lift up to 20 pounds occasionally, and is able to lift and carry up to 10 pounds frequently in light work; stand and walk for approximately 6 hours per eight-hour work day, and sit for approximately 2 hours of an eight-hour

work day with normal breaks. She may never climb ladders, ropes or scaffolds, but may occasionally climb ramps and stairs, balance, stoop, crouch, kneel and crawl. She must avoid concentrated exposure to extreme cold, heat, excessive vibration, irritants such as fumes, odors, dust, gases, and moderate exposure to hazards, such as moving machinery and unprotected heights.

(Tr. at 25-31, Finding No. 5). The ALJ determined at the fourth step that Claimant had no past relevant work. (Tr. at 31, Finding No. 6). Under the fifth and final step, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine if she would be able to engage in substantial gainful activity. (Tr. at 31-33, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1959 and was defined as an individual closely approaching advanced age; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because Claimant did not have past relevant work. (Tr. at 31, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy. (Tr. at 31-33, Finding No. 10). At the unskilled light level, Claimant could work as a mailroom clerk, kitchen worker, or hand packer; and at the unskilled sedentary level, Claimant could perform jobs such as a surveillance system monitor, assembler, or product inspector. (Tr. at 32). Thus, the ALJ concluded that Claimant was not disabled at any time from the alleged onset date through the date last insured. (Tr. at 33, Finding No. 11).

## IV.   **Claimant's Challenges to the Commissioner's Decision**

Claimant argues that the Commissioner's decision is not supported by substantial evidence on the basis that (1) the ALJ failed to adequately weigh and articulate his rationale for discounting Claimant's credibility and the opinions of her treating sources. (ECF No. 13 at 6-11); (2) Claimant qualifies as disabled under the grid rules. (*Id.* at 11);

and (3) the Appeals Council wrongfully failed to consider the new material submitted subsequent to the hearing. (*Id.* at 12).

## V.    Relevant Medical Records

The Court has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The Court has confined its summary of Claimant's treatment and evaluations to those entries most relevant to the issues in dispute.

### A.  Treating Source Records

#### 1. *Pre-Onset of Alleged Disability (6/8/2008 – 7/9/2009)*

On June 8, 2008, Claimant sought emergency treatment at CAMC Teays Valley Hospital ("TVH") with complaints of "severe right flank pain" and right lower back pain. (Tr. at 258). Claimant's physical examination was essentially within normal limits, except for observed "right-sided CVA tenderness" and "tenderness along the right lower lumbar paraspinal musculature" and "straight leg raise positive on the right." (Tr. at 258). X-ray results of Claimant's lumbar spine revealed "mild degenerative change at the L5-S1 level" but "no acute processes," while a "CT scan of the abdomen and pelvis with stone protocol reveal[ed] no evidence of kidney or ureteral stones." (Tr. at 259-60). Claimant was assessed with "flank pain, possibly secondary to kidney stone that has passed" and "low back pain most likely secondary to degenerative changes at L5-S1." (Tr. at 259). Claimant was given Toradol and a prescription for Naprosyn; instructed on the benefits of weight loss, exercises, and stretching to cope with her chronic back pain; and issued a work release for 2 days. (*Id.*).

On August 29, 2008, Claimant sought emergency treatment at TVH with complaints of low back pain radiating down to her hips. (Tr. at 266-76). Her physical examination was essentially within normal limits, except for "some paraspinal tenderness

in the low back region." (Tr. at 266). Claimant was given Lortab 5, Skelaxin, and a Medrol Dosepack, (Tr. at 266), and instructed to follow up with Dr. Sean DiCristafaro, her primary care physician. (Tr. at 276). On September 5, 2008, Dr. DiCristafaro ordered a full body bone scan, which was performed on September 12, 2008. (Tr. at 277-78). The bone scan revealed "mild uptake seen in the bilateral shoulder joints, sternoclavicular joints, right greater than left knee, and feet." (Tr. at 278). The report speculated that this was "perhaps arthritic change," as there was "[n]o focal bony uptake to suggest osteoblastic metastatic or primary bone disease." (Tr. at 278).

On October 3, 2008, Dr. DiCristafaro referred Claimant to Dr. Vanscoy for evaluation and treatment of lower back pain and multiple joint pains. (Tr. at 651). However, there is no record of any subsequent treatment by Dr. Vanscoy.

On February 5, 2009, Claimant was evaluated for monoarthritis. (Tr. at 690). Claimant reported that her symptoms had generally been better since her last appointment, and "denie[d] significant pain or swelling of her bilateral knee, hand and feet joints." although she did report orthopnea and tingling or numbness bilaterally in her hands. (Tr. at 690-91). Claimant's physical examination was within normal limits. (Tr. at 691-92). Claimant was assessed with osteoarthrosis; osteoarthrosis, generalized, hand; osteoarthrosis, Knee; R/O Capal Tunnel Syndrome; +ANA, most likely from thyroid disorder; and Hypothyroidism. (Tr. at 692).

On March 9, 2009, Claimant was seen by Dr. DiCristafaro with complaints of pain in her right knee related to a Baker's cyst which had become larger and very painful over the past couple weeks. (Tr. at 623). Claimant reported difficulty bending her knee and walking, as well as climbing stairs. (Tr. at 623). Examination of Claimant's right knee revealed "crepitus with flexion extension on palpation of the patella" with a "very large

mass which is palpable in the popliteal fossa." (Tr. at 623). The cyst was also "soft inconsistent with a Baker's cyst" and mildly tender to palpation. (Tr. at 623). There was no superficial erythema but trace pre-tibial edema was noted in the bilateral lower extremities, as well as limited flexion of the right lower extremity at the knee due to the cyst. (Tr. at 623). Dr. DiCristafaro noted that the "cyst is rather large and has changed recently" and recommended Claimant be evaluated by an Orthopedicst for possible surgical excision. (Tr. at 623).

On March 23, 2009, an MRI of Claimant's right knee revealed that "small joint diffusion [was] present" and there were "truncations anterior meniscus and slight displacement of the meniscus anteriorly, compatible with meniscal tear." (Tr. at 280). Additionally, "minimal edema [was] seen within the patella, compatible with chondromalacia patella." (Tr. at 280). Accordingly, Claimant was assessed with "thinning of the anterior horn of the medial meniscus suspicious for meniscal tear," "small joint effusion," and "chondromalacia patella." (Tr. at 280).

Claimant apparently underwent a right knee arthroscopy for a torn meniscus on May 5, 2009. (Tr. at 283, 455). However, there are no available records documenting the operation.

On June 18, 2009, Claimant was treated for left knee pain and diagnosed with joint pain. (Tr. at 281). X-ray results dated June 22, 2009 revealed "mild degenerative changes with some mild medial joint space loss and early osteophyte formation." (Tr. at 282). Accordingly, Claimant was assessed with "early mild degenerative joint disease in the medial compartment of the [left] knee." (Tr. at 282).

On July 9, 2009, Claimant was seen by Dr. DiCristafaro with complaints of "a lot of pain from knees," as well as sinus and ear pain and headache. (Tr. at 624). Claimant's

physical exam revealed "crepitus on palpation of the patella's bilaterally with flexion extension" and "mild joint line effusion noted bilaterally at the knee," as well as "subjective complaint of pain with active and passive range of motion." (Tr. at 624). Dr. DiCristafaro assessed Claimant with diffuse osteoarthritis, "acute on chronic bronchitis," and elevated blood pressure, and prescribed medication for her pain and respiratory complaints accordingly. (Tr. at 624).

### 2.  Alleged Onset – Date Last Insured (7/20/2009 – 9/30/2010)

On July 20, 2009, Claimant sought emergency treatment at TVH for severe knee pain. (Tr. at 283-95, 459-60). Claimant reported that while at work, she twisted to her right to throw trash in a bin, at which point she "twisted her knee and then felt an excruciating pop." (Tr. at 283). Claimant rated her pain as 10 on a ten-point pain scale when attempting to move or bear weight on her right lower extremity. (Tr. at 283). Physical examination of Claimant's right knee revealed "some mild generalized edema" and "tenderness to palpation of the patella and patellar translation tenderness." (Tr. at 283). She had a negative valgus varus stress test and "negative anterior posterior drawer signs" regarding joint laxity, but had "excruciating pain" on the anterior drawer sign. (Tr. at 283). Claimant could fully extend the knee, but flexion to 80 degrees elicited pain. (Tr. at 283). X-ray results of Claimant's right knee showed "degenerative changes but no fracture or dislocation." (Tr. at 283, 295, 459-60). Claimant was diagnosed on discharge with "right knee sprain, rule out internal derangement of the knee," instructed to schedule an appointment with Dr. James Cox, an Orthopedist, and given a one-week medical work release. (Tr. at 284).

On July 29, 2009, Claimant attended an intake appointment at Teays Valley Orthopedics for left knee pain. (Tr. at 452-58). Claimant reported that her left knee

occasionally locked up and gave out on her, and stated that it was "starting to act like her right knee did prior to her arthroscopy." (Tr. at 455). Physical examination of Claimant's left knee revealed full range of motion, stable ligaments, and NV intact, but there was mild crepitus, mild swelling medially, and medial joint line tenderness. (Tr. at 456). Claimant was diagnosed with osteoarthritis of the left knee, and a left knee MRI was ordered. (*Id.*). During the appointment, Dr. Cox agreed to treat Claimant's right knee pain as well. (*Id.*). On July 31, 2009, Claimant's left knee MRI revealed a "tear of the posterior horn of the medial meniscus with moderate knee joint effusion and a developing small Baker's cyst measuring about 2.5 cm in size." (Tr. at 449).

On August 3, 2009, Claimant was seen by Dr. DiCristafaro with complaints that her knees were "very bad at this point." (Tr. at 626). Claimant reported "having significant difficulty ambulating," and noted "that the pain is severe at times." (Tr. at 626). Physical examination revealed mild effusion at the joint line of Claimant's left knee and significant crepitus in both knees with flexion/extension. (*Id.*). Claimant had "some difficulty standing from a seated position, but once ambulating seem[ed] to do ok." (Tr. at 626). Dr. DiCristafaro assessed Claimant with "osteoarthritis bilateral knees" and a meniscal tear, and provided her with a work excuse through August 26, 2009. (Tr. at 626). Claimant was instructed to schedule a follow-up appointment after seeing Dr. Cox. (Tr. at 627).

On August 26, 2009, Claimant was seen by Dr. Cox for a follow-up appointment regarding her left knee. (Tr. at 447). Claimant reported minimal problems with her left knee, except for occasional very sharp pains, and denied continuous aching or swelling. (Tr. at 447). Dr. Cox noted that Claimant's left knee MRI showed degenerative changes and "a fairly sizable tear of the posterior horn of the medial meniscus." (Tr. at 447).

Claimant's physical examination showed "significant swelling in the right knee [but] not really on the left," "diffuse tenderness around the right knee, not on the left" and "definite patellar crepitus on the right side and to a lesser extent on the left," but "no gross instability in either knee." (Tr. at 447). Dr. Cox diagnosed Claimant with "osteoarthritis bilateral knees with torn medial meniscus left knee and status post arthroscopic debridement of the right knee," and recommended left knee arthroscopy. (Tr. at 447). However, Claimant requested more conservative arthritis treatment for both knees, without an arthroscopy for at least six months, which Dr. Cox agreed was "an appropriate course of action for now." (Tr. at 447).

On September 9, 2009, Claimant was seen by a certified physician's assistant, Christopher M. Santangelo, at Teays Valley Orthopedics, with complaints of "severe pain anteriorly and along the medial joint line" of her right leg. (Tr. at 404). Examination of her right knee revealed "near full range of motion slowly with pain," "swelling throughout the knee, more so anteriorly," and "significant medial joint line tenderness." (Tr. at 404). Mr. Santangelo was unable to perform any special tests due to increased pain. (*Id.*). Claimant was assessed with "osteoarthritis, right knee with acute sprain." (Tr. at 404). Mr. Santangelo ordered an MRI of Claimant's right knee and gave her a work release until the MRI could be reviewed. (Tr. at 404).

On September 18, 2009, Claimant's right knee MRI scan reflected "progressed medial femoral condyle chondromalacia now with subcortical edema changes, mostly within the medial tibia," with findings being "suspicious for a retear of the posterior horn, medial meniscus which may be a root type tear and displacement of meniscus medially," as well as a "partial tear of the deep fibers medial collateral ligament," and "Grade III-IV patella chondromalacia." (Tr. at 437). On September 21, 2009, Claimant met with Dr. Cox

who indicated that her MRI results revealed "that the meniscus has either been previously excised at the time of her last arthroscopy or she has a new extensive tearing." (Tr. at 400). There was also extensive posttraumatic arthritis change and fairly advanced patellar chondromalacia. (Tr. at 400). Physical examination of Claimant's right knee revealed "tenderness over the medial joint line, positive tenderness over the medial collateral ligament with MCL stress testing, no gross instability of the MCL." (Tr. at 400). There was also "tenderness over the MCL and over the medial joint line, positive Apley's grind test of the medial side, mild pain with patellar compression, [and] full range of motion." (*Id.*). Dr. Cox recommended a repeat arthroscopy of the right knee after determining that "continued conservative management is not going to be an option here." (Tr. at 400). Claimant received three Synvisc injections in her left knee on September 25, October 2, and October 9, 2009. (Tr. at 396, 398, 427).

On October 29, 2009, Claimant underwent a second diagnostic and surgical right knee arthroscopy, which revealed "global grade IV chondromalacia throughout the entire weightbearing dome of the medial femoral condyle" as well as "evidence of a previous partial meniscectomy. . . with a small recurrent radial tear at about the 2 o'clock position," and "global grade III-IV chondromalacia of the entire chondral surface of the patella." (Tr. at 304-05). There were no apparent complications and Claimant tolerated the procedure well. (Tr. at 305).

On November 9, 2009, Claimant attended a follow-up appointment at Teays Valley Orthopedics for suture removal. (Tr. at 379). Claimant reported that "her knee feels much better than it did prior to her surgery" and that she was "currently in physical therapy and doing well." (Tr. at 379). Claimant was assessed with "status post diagnostic and surgical arthroscopy of the right knee with partial medial meniscectomy and microfracture medial

femoral condyle and chondroplasty of the patella." (Tr. at 379). Claimant was instructed to remain non-weightbearing for two more weeks and to resume her physical therapy. (Tr. at 379).

On December 14, 2009, Claimant attended another follow-up appointment at Teays Valley Orthopedics, where she was observed to be "doing really well with her right knee." (Tr. at 378). Claimant reported that she had "mild discomfort at times but overall [was] doing really well" and "progressing very well with physical therapy," while PA Santangelo noted "[h]igh grade arthritis, medial femoral condyle and patella." (Tr. at 378). Physical examination of Claimant's right knee revealed full range of motion, mild crepitance, and mild swelling throughout the knee, but her knee was stable and NV was intact. (Tr. at 378). Mr. Santangelo ordered three Synvisc injections to the right knee and issued a work release for another 6-8 weeks. (Tr. at 378).

On January 13, 2010, physical therapist Christin Knell, MPT of Teays Physical Therapy Center, wrote Dr. Cox a letter recommending that Claimant discontinue formal physical therapy due to her failure to keep appointments.[1] (Tr. at 399). Ms. Knell reported that Claimant was last seen on December 18, 2009, at which time she reported "increasing her activity level with walking" and "a decrease in her knee pain overall." (Tr. at 399). At that time, her range of motion was extension -5° and flexion 135°; right knee strength was 5/5 throughout; prone knee flexion was 130°, and she ambulated without an assistive device. (Tr. at 399). Ms. Knell indicated that she had not heard from Claimant since her last visit and had attempted to contact her without success. Therefore, she was discharged from Ms. Knell's care. (Tr. at 399).

Claimant received three Synvisc injections in her right knee on January 15,

---

[1] Elsewhere in the record, Claimant reported that "Dr. Cox told her to discontinue therapy due to 'It wouldn't do any good' to continue due to joint damage." (Tr. at 370).

January 22, and January 29, 2010. (Tr. at 373, 376, 383). Dr. Cox also provided a work excuse from January 29, 2010 to March 2, 2010. (Tr. at 387).

On March 1, 2010, Claimant was seen by Dr. Cox for a follow-up appointment. (Tr. at 374). Claimant reported that her right knee "definitely feels better after surgery and after Synvisc injections," but Dr. Cox noted that "it is certainly not to the point that she can go back to her normal job." (Tr. at 374). X-ray results of Claimant's right knee reflected "near complete loss of the medial joint space" and "extensive subchondral sclerosis at the medial tibial plateau." (Tr. at 381). Claimant's physical examination revealed mild swelling and definite medial joint line tenderness, and she was observed to walk with a limp. (Tr. at 374). Dr. Cox assessed Claimant with "posttraumatic arthritis, right knee particularly involving the medial compartment with complete loss of the medial joint space," and discussed future treatment involving "some sort of resurfacing procedure such as a[n] Oxford medial unicompartmental arthroplasty versus potentially a high tibial osteotomy." (Tr. at 374). Claimant was instructed to continue her home exercises and medication, and received another work release until her next follow-up appointment in four weeks. (*Id.*). Dr. Cox also ordered a functional capacity evaluation. (Tr. at 374).

On April 23, 2010, Claimant was seen by Dr. DiCristafaro with complaints of frequent headaches and diffuse joint and muscle pain. (Tr. at 630). Claimant reported that "her muscles ache even in the absence of touch" and the pain was "severe at times and that the only relieving factor is to lay in bed." (Tr. at 630). Claimant also reported that she was "unable to stand or sit for prolonged period[s] of time due to pain and finds that she has to change positions frequently," although she did note that "Savella seems to help with her muscle pain and her joint pain to a lesser extent." (Tr. at 630). Claimant's

physical exam revealed "trace edema in the bilateral lower extremities," an antalgic gait, and "pain on palpation of greater than 15 trigger points throughout the musculature of the upper extremities and torso." (Tr. at 630). Dr. DiCristafaro assessed Claimant with hypertension, fibromyalgia, and "headache likely secondary to hypertension which is uncontrolled," and prescribed Bystolic for hypertension and Lortab for pain management. (Tr. at 630-31).

On May 25, 2010, Claimant was seen by Dr. DiCristafaro with complaints of "being awakened at 5 am with crushing pain in her chest." (Tr. at 632). Claimant reported that "the pain was very severe [and] she was unable to get out of bed initially as she could not raise her arms." (Tr. at 632). She also had associated nausea and shortness of breath. (Tr. at 632). Physical examination of Claimant's lungs revealed "mild expiratory wheezing noted with good air movement," while her cardiovascular examination revealed "S-1, S2 with a grade 1/6 systolic ejection murmur heard best at the left sternal border." (Tr. at 632). Claimant's extremities showed trace pre-tibial edema but "no cyanosis appreciated." (Tr. at 632). Claimant had an EKG, which showed "normal sinus rhythm with no acute ST changes." (Tr. at 632). Dr. DiCristafaro assessed Claimant with chest pain, hypertension, hyperlipidemia, family history of coronary artery disease, and tobacco abuse, and "recommended that [Claimant's] husband take her emergently to the hospital" immediately across the street. (Tr. at 632).

Claimant then sought emergency treatment at TVH for her chest pain, and was admitted for further observation over the course of two days. (Tr. at 321-62). Claimant's chest x-ray results reflected "a normal heart size" with "no infiltrate, effusion, edema, or pneumothorax" and "no radiographic evidence of acute process. (Tr. at 333). Claimant underwent an upper endoscopy and biopsy, which revealed a "small sliding hiatal hernia"

as well as inflamed gastric mucosa in the gastric antrum with multiple small erosions, and in the duodenal bulb. (Tr. at 330). Accordingly, Claimant was diagnosed with "antral mucosa with mild chronic inflammation, focal acute inflammation and reactive epithelial changes," "fundus mucosa with mild chronic inflammation" and "esophageal squamous mucosa with mild basal cell hyperplasia and elongation of the lamina propria papillae, consistent with reflux esophagitis." (Tr. at 331). On May 27, 2010, Claimant was discharged with instructions to follow up with Dr. DiCristafaro and to return to the emergency room if her conditioned worsened. (Tr. at 361).

On June 23, 2010, Claimant was treated by Dr. David S. Ratliff, M.D. for a "routine follow up after EGD on 5/27/2010." (Tr. at 479). Claimant reported "chest pain, palpitations, lower extremity edema" and wheezing, as well as having "cuts slow to heal." (Tr. at 480). Claimant's physical exam reflected that her breathing was "unlabored without accessory muscle use," lungs were "clear with no wheezing, rales, or ronchi," heart rate was regular with normal rhythm and no murmurs, and abdomen was essentially within normal limits. (Tr at 480-81). Claimant was assessed with a "Helicobacter Pylori (H. Pylori) Infection." (Tr. at 481). Dr. Ratliff recommended that Claimant have a CT abdomen scan in light of "persistent symptoms of nausea and vomiting," once she received a medical card. (Tr. at 481).

On July 15, 2010, Claimant called Dr. Cox regarding a "form sent to DHHS" and stated that "she needs to be off work 12 months." (Tr. at 363). A nurse informed Claimant that the form had already been completed by Dr. Cox and that "[t]he amount of time was for his treatment/surgery and he does not become PCP for chronic problems." (Tr. at 363).

On July 16, 2010, Claimant was seen by Dr. DiCristafaro for a follow-up

appointment. (Tr. at 633-34). Claimant complained of "a severe headache over the past week or more" after abruptly running out of blood pressure medication, as well as "some mild chest pressure which has not been radiating." (Tr. at 633). Claimant reported widespread and significant pain in her muscles and joints. (Tr. at 633). Claimant reported that Savella "does seem to make a positive difference in her functional ability" but that her abilities were limited at this point, and that she had run out of medication. (Tr. at 633). Claimant also reported experiencing a depressed mood, poor motivation, and lack of activity due to pain, and noted that the Savella seemed to help with her depression as well. (Tr. at 633). Claimant's physical exam revealed that she had "no acute respiratory distress," but her gait was "abnormal due to musculoskeletal etiologies." (Tr. at 633).  Dr. DiCristafaro observed that Claimant's affect was flat and mood was depressed, but otherwise her mental status was within normal limits. (Tr. at 633). Dr. DiCristafaro also observed "over 15 trigger points which [were] tender, palpated in the upper and lower extremities." (Tr. at 633). Accordingly, Dr. DiCristafaro assessed Claimant with "hypertension uncontrolled," fibromyalgia, depression, and diffuse osteoarthritis. (Tr. at 633). Dr. DiCristafaro refilled Claimant's medications and instructed her to follow up in three months. (Tr. at 633-34). Dr. DiCristafaro also filled out a DHHS Physician's Summary, in which he listed Claimant's diagnoses of "osteoarthritis knees, fibromyalgia, hypertension, depression," opined that her prognosis was "good" and indicated that her incapacity/disability was expected to last 12 months. (Tr. at 666). Regarding "employment limitation," Dr. DiCristafaro explained that Claimant had "limited range of motion due to knee pain and diffuse joint pain." (*Id.*).

On September 29, 2010, Claimant underwent a ventilator function assessment, which revealed "normal PFS." (Tr. at 463-65).

### 3. Post-Date Last Insured (10/26/2010 – 7/11/2011)

On October 26, 2010, Claimant received a CT pelvis and CT abdomen scan. (Tr. at 482-83). Findings revealed "no evidence of acute abdominal or pelvic abnormality," although there was "fatty infiltration of the liver," a "small left renal cyst," and "questionable gastric mucosal fold thickening versus incomplete distention." (*Id.*).

On November 1, 2010, Claimant was seen by Dr. DiCristafaro for a blood pressure check. (Tr. at 635). Claimant had elevated blood pressure and complained of headache and increased fatigue, although she did report that she had stopped taking Bystolic abruptly more than a one week prior. (Tr. at 635). Claimant denied any chest pain or palpitations, but reported "increased cough with sputum production" and "chronic cough and shortness of breath particularly with exertion," and noted "most recently that this [has] gotten a little worse." (Tr. at 635). Claimant denied any fever, chills, nausea, vomiting, diarrhea, or hemoptysis. (Tr. at 635). Dr. DiCristafaro observed that Claimant's throat was clear but her nasal passage was "mildly edematous and erythematous" while her lungs revealed "scattered inspiratory and expiratory wheeze" and "occasional rhonchi which clear with cough." (Tr. at 635). Dr. DiCristafaro also observed "multiple trigger points noted throughout the upper extremities and torso to palpation." (Tr. at 635). Accordingly, Dr. DiCristafaro assessed Claimant with hypertension, chronic bronchitis, fatigue, and hypothyroidism; prescribed medication accordingly; and instructed her to follow up in two weeks. (Tr. at 635-36).

On December 16, 2010, Claimant received a full history and physical examination at TVH in anticipation of a right knee unicompartmental arthroplasty. (Tr. at 512-20). Chest x-rays demonstrated a "normal configuration of the cardiomediastinal silhouette" and "no acute areas of consolidation," resulting in an impression of "no radiographic

evidence of acute intrathoracic disease." (Tr. at 518).

On December 21, 2010, Claimant's physical examination reflected that her lungs were clear throughout the lung fields on the left side, although she had "inspiratory wheezing throughout the fields on the right side." (Tr. at 505). Claimant had full range of motion in her right knee, but there was severe crepitance and "swelling throughout the knee, more so medially," as well as tenderness along the medial joint line. (Tr. at 506). Claimant's knee was stable and NV was intact. (Tr. at 506). Claimant was assessed with "advanced osteoarthritis medial compartment, right knee," and she confirmed her wish to proceed with surgery. (Tr. at 506).

Claimant underwent a right knee unicompartmental arthroplasty, (Tr. at 499-501), which resulted in the following findings: "(1) Grade IV chondromalacia medial tibial plateau and weightbearing dome of the medial femoral condyle. (2) Rimming osteophytes of the distal femur. . . [which] were completely resected with rongeurs and osteotomes. (3) Preoperative varus alignment of the knee which was corrected to a normal alignment throughout the course of the operation." (Tr. at 499). There were no apparent complications and Claimant tolerated the procedure well. (Tr. at 501). A subsequent x-ray of Claimant's knee reflected that there "ha[d] been an arthroplasty performed in the medial compartment" and that there was "normal alignment without definite fracture." (Tr. at 531). On December 23, 2010, Claimant was discharged with a primary diagnosis of "anteromedial arthritis of right knee" and instructed to follow up with Dr. Cox in two weeks, begin outpatient physical therapy three times a week for six weeks, and follow total joint replacement precautions. (Tr. 510, 522).

On February 16, 2011, Claimant was seen by Dr. DiCristafaro with complaints of knee pain and increased fatigue. (Tr. at 637-38). Claimant reported experiencing severe

pain in both knees at times, but that her left knee was worse. (Tr. at 637). She also reported "swelling and erythema of both joints on a regular basis." (Tr. at 637). Claimant's physical exam revealed "scattered wheezes with fair air movement noted throughout" her lungs. (Tr. at 637). There was "limited flexion extension of the knees bilaterally" and "significant crepitus over both knees with flexion extension" as well as "joint effusion noted bilaterally." (Tr. at 637). Claimant's left knee was "particularly warm to touch." (Tr. at 637). Dr. DiCristafaro assessed Claimant with rheumatoid arthritis, hyperlipidemia, and fatigue, and noted that Claimant's rheumatologist was tapering her prednisone medication, and that she was scheduled for a partial left knee replacement within a week. (Tr. at 637). Dr. DiCristafaro opined that Claimant's fatigue was "a combination of reaction pain, depression, and possible metabolic etiologies" and recommended that Claimant take a vitamin B12 supplement. (Tr. at 638).

### B. Residual Functional Capacity Opinions

#### 1. State Agency Consultative RFC Opinions

On October 22, 2010, Rogelio Lim, M.D. provided a physical RFC opinion of Claimant based upon her medical records. (Tr. at 466-73). Dr. Lim opined that Claimant could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk (with normal breaks) for a total of 6 hours in an 8-hour workday, sit (with normal breaks) for a total of 6 hours in an 8-hour workday, and had unlimited ability to push/pull. (Tr. at 467). Dr. Lim opined that Claimant could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. at 468). Dr. Lim assigned no manipulative, visual, or communicative limitations to Claimant. (Tr. at 469-70). As for environmental limitations, Dr. Lim opined that Claimant could withstand unlimited extreme heat, wetness, humidity, and noise; but that she should avoid concentrated exposure to extreme cold,

vibration, irritants such as fumes, odors, dusts, gases, and poor ventilation, and hazards such as machinery and heights. (Tr. at 470). Furthermore, Dr. Lim found that Claimant's allegations were not fully credible, (Tr. at 473), as they were "not supported by medical evidence." (Tr. at 472). Dr. Lim explained that Claimant's knee pain was "due to mild DJD on x-ray and possible tear of meniscus, but no surgery [was] done, no knee replacement," and that Claimant was "fully ambulatory without ambulatory aids." (Tr. at 472). Dr. Lim further found that fibromyalgia was not disabling; her hypothyroidism was not disabling and was corrected by thyroid replacement; her allegations of COPD were inconsistent with her pulmonary function tests; and that despite her low back pain there were no objective findings of radiculopathy. (Tr. at 472). Accordingly, Dr. Lim found that multiple allegations were "out of proportion to objective findings." (Tr. at 472).

On October 27, 2010, G. David Allen, Ph.D. completed a Psychiatric Review Technique of Claimant, (Tr. at 484-97), in which he concluded that there was "insufficient medical evidence of record prior to date last insured" to assess Claimant's allegation of depression. (Tr. at 495).

On January 24, 2011, Karl G. Hursey, Ph.D. completed a Psychiatric Review Technique of Claimant, (Tr. at 552-65), in which he noted that there had been "no new psych allegations and no new medical evidence on record" since Dr. Allen's assessment. (Tr. at 564). Accordingly, Dr. Hursey concluded that the "medical evidence on record [was] insufficient prior to the date last insured to assess this case." (Tr. at 564).

On February 1, 2011, Fulvio Franyutti, M.D. provided a physical RFC opinion of Claimant based upon her medical records. (Tr. at 566-74). Dr. Franyutti opined that Claimant could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk (with normal breaks) for a total of at least 2 hours in an 8-hour

workday, sit (with normal breaks) for a total of 6 hours in an 8-hour workday, and had unlimited ability to push/pull. (Tr. at 567). Dr. Franyutti opined that Claimant could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; and could never climb ladder/rope/scaffolds. (Tr. at 568). Dr. Franyutti assigned no manipulative, visual, or communicative limitations to Claimant. (Tr. at 569-70). As for environmental limitations, Dr. Franyutti opined that Claimant could withstand unlimited extreme wetness, humidity, and noise; but that she should avoid concentrated exposure to extreme cold, extreme heat, vibration, and irritants such as fumes, odors, dusts, gases, and poor ventilation; and should avoid even moderate exposure to hazards such as machinery and heights. (Tr. at 570). Dr. Franyutti explained that his opinion was informed by new allegations of "increased left knee pain, ulcers, hiatal hernia," as well as a May 27, 2010 TVH operative report finding a "small, sliding hiatal hernia," and Dr. Ratliff's June 23, 2010 progress note observing that Claimant "Path report reveals mild chronic inflammation, reflux esophagitis." (Tr. at 573-74).

### 2.  Treating/Examining Source RFC Opinions

On April 7, 2010, physical therapist Doug James, PT, OCS, Cert. MDT of Teays Physical Therapy Center provided a Functional Capacity Evaluation of Claimant, pursuant to a referral from Dr. Cox. (Tr. at 368-71). During the evaluation, Claimant "sat for approximately one hour during interview, pain questionnaires, hand tests, etc. without complaints of or apparent difficulty" and was "on feet for 23 minutes before asking to sit." (Tr. at 371). Mr. James observed that Claimant "tended to bear weight mostly throughout left leg/foot during static standing," and that her right antalgic limp worsened as the exam progressed. (Tr. at 371). Mr. James opined that Claimant had the functional capacity to engage in waist-to-should lifting of 47 lbs rarely (0-5% of an 8-hour

workday), and 40 lbs occasionally (6-33% of an 8-hour workday); waist-to-overhead lifting of 37 lbs rarely, and 31 lbs occasionally; static pushing of 47 lbs rarely, and 40 lbs occasionally; static pulling of 26 lbs rarely, and 22 lbs occasionally. (Tr. at 368).

Mr. James opined that Claimant could frequently/constantly sit, reach, and bend; occasionally stand and walk; rarely kneel and crawl; and never climb stairs, balance, or squat, based upon physical testing. (Tr. at 368, 371). Mr. James observed that Claimant "demonstrated impaired right knee range of motion (-4 to 130°) and strength (4+/5 quad strength)" and "had a moderate knee joint effusion." (Tr. at 368). Claimant also "demonstrated an antalgic right limp that worsened as the test progressed" and "asked to sit to rest due to knee pain after 23 minutes on her feet." (Tr. at 368). Claimant's Pain Disability Index ranked in the 67th percentile, reflecting moderate/high perceived disability. (Tr. at 368). Her scores on the Pain Catastrophizing Scale (measuring Catastrophic Thinking), Tampa Scale for Kinesiophobia (measuring Fear of Pain/Re-injury), and McGill Pain Questionnaire (measuring Pain Severity) were very low. (*Id.*). Claimant's evaluation results reflected that she was capable of sedentary work. (Tr. at 368). Furthermore, her test results were considered valid based upon a score of 16 out of 16 on validity indicators. (Tr. at 368).

Mr. James noted that Claimant's "FCE rating of Sedentary suggests she is not functioning at the level required for her work," and that she "does not appear to be a good candidate for work conditioning." (Tr. at 369). Mr. James recommended that Claimant continue her with treatment per her physician's discretion, and opined that "she could perform work at the Sedentary level (mostly sitting with rare/occasional walking and standing) if available from her employer." (Tr. at 369).

On April 19, 2010, Claimant attended a follow-up appointment with Dr. Cox, with

continued complaints of right knee pain and "quite a bit" of limping. (Tr. at 366). Dr. Cox reviewed the recent medical findings, noting that (1) Claimant's x-rays and arthroscopic findings reflect that she has "grade IV chondromalacia with complete joint space loss in the medial compartment"; (2) Mr. James' Functional Capacity Evaluation "puts her at a sedentary physical demand level compared to a medium level required for her normal duties"; and (3) Dr. Marsha Bailey's independent medical examination opined that Claimant "is at maximum medical improvement and any remaining issues that she is having with her knee are the result of arthritis and not the injury itself." (Tr. at 366). Regarding Dr. Bailey's opinion, Dr. Cox did not disagree with her assessment, but expressed "concern[ ] about the suggestion that [Claimant] simply go back to work," instead opining that Claimant was "unsafe to return to her normal duties at her current functioning level" and recommending "that she talk to her employers about a more sedentary job." (Tr. at 366). Accordingly, Dr. Cox issued a work release with modified duty restrictions, which included working part time (8 hour shifts) with no overtime; no pushing, pulling, climbing, kneeling, or lifting over 25 lbs; no standing more than three hours per shift; and no walking more than one hour per shift. (Tr. at 365-66).

On August 23, 2011, Dr. DiCristafaro completed a physical RFC Opinion of Claimant, pursuant to her counsel's request. (Tr. at 614-19). Dr. DiCristafaro opined that Claimant could occasionally lift and carry up to 10 lbs, and explained that her polyarthralgia limited her range of motion and ability to tolerate and carry weight. (Tr. at 614). Claimant could sit, stand, and walk up to thirty minutes at a time without interruption, each; could sit up for three hours total in an 8 hour workday, and could stand and walk for two a total of two hours each in an 8 hour workday. (Tr. at 615). Dr. DiCristafaro noted that Claimant was "unable to sit or stand continuously for prolonged

periods of time" and that she "has to change positions frequently for pain relief." (Tr. at 615). Dr. DiCristafaro elaborated that "this is not uncommon in patients with multiple joint involvements related to rheumatoid arthritis." (Tr. at 615). Dr. DiCristafaro opined that Claimant could never reach (overhead) due to limited range of motion in her shoulders, but that she could occasionally reach (all other), handle, finger, feel, and push/pull. (Tr. at 616). Dr. DiCristafaro explained that Claimant's "hands are involved [due to] RA & she has decreased range of motion" and that her ability to push/pull was "limited by her orthopedic condition" as "she is unlikely to move any big weight." (Tr. at 616). Dr. DiCristafaro opined that Claimant could never operate foot controls because she was "unlikely to generate enough power to operate a foot control or machinery with regularity" due to "surgery on her knees which limits this function." (Tr. at 616). Regarding postural activities, Claimant could occasionally climb stairs and ramps, but could never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl "due to the poor conditions of the joints of her lower extremities." (Tr. at 617). Dr. DiCristafaro elaborated that Claimant was "able to climb stairs with taxing effort and without regard to speed." (Tr. at 617). Regarding environmental limitations, Claimant could occasionally operate a motor vehicle, but could never tolerate unprotected heights, moving mechanical parts, humidity and wetness, irritants such as dust, odors, fumes and other pulmonary irritants, extreme cold, extreme heat, or vibrations. (Tr. at 618). Dr. DiCristafaro stated that Claimant was "not safe in unprotected heights or in situations that require rapid response or movements," and that her "current lung status is worsened by poor air quality and humidity (consistent with reaction experiences by persons with COPD)." (Tr. at 618). Finally, regarding activities of daily living ("ADL's"), Dr. DiCristafaro opined that Claimant could "perform activities such as shopping," ambulate without aids, use

standard public transportation, prepare a simple meal and feed herself, and care for personal hygiene, but that she could not travel without a companion, walk a block at an reasonable pace on rough or uneven surfaces, climb a few steps at a reasonable pace with the use of a single hand rail, or sort, handle, use paper/files, due to limited "mobility and fine motor function" resulting from her rheumatoid arthritis. (Tr. at 619).

Additionally, Dr. DiCristafaro responded to a series of questions posed by Claimant's counsel regarding Claimant's functional capacity. (Tr. at 611-12). Dr. DiCristafaro asserted that Claimant's "subjective complaints of pain and fatigue are consistent with her current condition as evidenced by her diagnosis of rheumatoid arthritis, COPD, and hypothyroidism." (Tr. at 611). Dr. DiCristafaro further stated that "individually these diagnoses can cause pain and fatigue; however, collectively their effect is likely synergistic." (Tr. at 611). Regarding Claimant's ability to engage in employment, Dr. DiCristafaro opined that he "do[es] not believe she can be gainfully employed due to her multiple medical problems," and noted that "it is unlikely that [Claimant] would ever return to her former position as a personal care attendant in a nursing facility as the physical demands are too great." (Tr. at 611). Dr. DiCristafaro explained that Claimant's "rheumatoid arthritis has led to multiple orthopedic problems including severe knee pain and decreased range of motion. (Tr. at 611). Dr. DiCristafaro further noted the Claimant was "also limited by fatigue which is likely related to a combination of chronic pain, COPD and hypothyroidism," and that her "functional capacity is diminished due to her lung function as well as deconditioning." (Tr. at 612).

## C.  New Evidence Submitted to the Appeals Council

On October 21, 2011, Paul W. Craig II, M.D. completed a consultative RFC opinion and summary of Claimant, at the request of Claimant's counsel. (Tr. at 14-17). In his

summary review, Dr. Craig stated that Claimant suffers from "widespread moderate to severe osteoarthritis in the knees, shoulders, likely in her hip joints as well as her low back and cervicothoracic spine," as well as "mild to moderate COPD with a history of bronchospasm and a history of asthma." (Tr. at 14). Dr. Craig observed "no documentation to confirm a diagnosis of rheumatoid arthritis," and also noted that Claimant "claims a history of fibromyalgia as well." (Tr. at 14). Dr. Craig observed that "she will likely need further care for the osteoarthritis and may need joint replacement in her right knee in the future" and that "her musculoskeletal conditions are further complicated by clinical findings consistent with bilateral carpal tunnel syndrome." (Tr. at 14). Additionally, Dr. Craig recommended that her "depressive affect and sleep cycle issues" be further evaluated and treated if necessary. (Tr at 14). Dr. Craig opined that "the combination of her medical problems and musculoskeletal problems cause her to be limited to a sedentary physical capacity category" and that she "has limited endurance as well." (Tr. at 14). Accordingly, Dr. Craig concluded that Claimant's combination of impairments "would more likely than not prevent her from performing work at an 8 hour per day, 5 day per week level." (Tr. at 14).

In his RFC opinion for the "time period of 3/23/2009 through 9/30/2010," (Tr. at 15), Dr. Craig opined that Claimant could lift/carry under 20 lbs; stand and/or walk 1-2 hours in an 8 hour workday, but could only do so without interruption for under an hour; could sit 4-6 hours in an 8 hour workday, but could only do so without interruption for 2-4 hours. (Tr. at 15-16). Regarding postural activities, Dr. Craig opined that Claimant could rarely balance or stoop, and could never climb, crouch, kneel, or crawl. (Tr. at 16). Claimant's ability to reach, handle, and push/pull were affected due to a decrease in lifting capacity, decrease in grip endurance, shoulder pain, neck and low back pain

resulting from her osteoarthritis. (Tr. at 17). Regarding environmental restrictions, Dr. Craig opined that Claimant "cannot work safely in an industrial environment" and thus restricted Claimant's exposure to heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity, vibration, and "other" hazards. (*Id.*). Dr. Craig further noted Claimant's "depressive affect" and opined that Claimant was "limited to sedentary to light activity not requiring a sustained effort." (*Id.*). Dr. Craig concluded that Claimant was "not able to work above a sedentary level and cannot maintain an 8 hour/day; 5 day per week job." (*Id.*).

On October 31, 2011, Claimant was treated by Dr. Olajide with complaints of "pain in her neck for the last 3 weeks or so," difficulty sleeping due to the pain, and shoulder pain as well. (Tr. at 8). Claimant's physical exam revealed "tenderness of the posterior neck" and tenderness on palpation of Claimant's shoulders. (Tr. at 10). Dr. Olajide diagnosed Claimant with osteoarthritis and "rheumatoid arthritis RF negative." (*Id.*). Dr. Olajide prescribed prednisone to Claimant, ordered imaging of the cervical spine, and instructed Claimant to return "early next year." (*Id.*).

## VI. **Standard of Review**

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. The Fourth Circuit has defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).

Additionally, the administrative law judge, not the court, is charged with resolving

conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

**VII.   Analysis**

### A.  Determination of Claimant's RFC

Claimant argues that the ALJ's RFC assessment is not supported by substantial evidence on grounds that the ALJ (1) failed entirely to address the RFC opinion of physical therapist Doug James, and improperly weighed the treating source opinions of Dr. DiCristafaro and Dr. Cox; and (2) erroneously discounted Claimant's credibility. (ECF No. 13 at 6-11).

#### 1.  *Weighing Medical Evidence and Opinions*

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including

[his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2). The relevant regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. *Id.* § 404.1527(c).

In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source, and even greater weight to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* § 404.1527(c)(1)-(2). However, the ALJ must analyze and weigh all medical source opinions in the record, including those of non-examining sources. *Id.* § 404.1527(e). If conflicting medical opinions are present in the record, the ALJ must resolve the conflicts by weighing the medical source statements and providing an appropriate rationale for accepting, discounting, or rejecting the opinions. *See Diaz v. Chater,* 55 F.3d 300, 306 n.2 (7th Cir. 1995). Relevant factors include: (1) length of the treatment relationship and frequency of evaluation; (2) nature and extent of the treatment relationship, (3) degree to which an opinion is supported by relevant evidence and explanations; (4) consistency of an opinion with the record as a whole, (5) whether the source is a specialist in the area relating to the rendered opinion; and (6) any other factors which tend to support or contradict the opinion, including "the extent to which an acceptable medical source is familiar with the other information in [a claimant's] case record. 20 C.F.R. § 404.1527(c)(2)-(6).

Medical source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus

would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." SSR 96-5p, 1996 WL 374183, at *2. However, these opinions must still always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *2-3. As explained in SSR 96-5p,

> The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner. If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.

*Id.* at *3. When the opinions of agency experts are considered, the ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the [ALJ] must do for any opinions from treating sources, non-treating sources, and other non-examining sources." 20 C.F.R. § 404.1527(e)(2).

Further, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184 *7 (S.S.A. 1996). A minimal level of articulation is "essential for meaningful appellate review," given that "when the ALJ fails to mention rejected evidence, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984) (quoting *Cotter v. Harris,* 642 F.2d 700, 705 (3d Cir. 1981)). While an ALJ need not provide a written evaluation of every piece of evidence on record, *Aytch v. Astrue*, 686 F.Supp.2d 590, 602 (E.D.N.C. 2010), he must build "an accurate and logical bridge from the evidence to his conclusions." *Young v. Astrue*, 771 F.Supp.2d 610, 619 (S.D.W.V. 2011) (quoting *Blakes v.*

*Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)); *Brown v. Astrue*, No. 3:10-cv-00411, 2011 WL 1743767, at *8 (S.D.W.V. May 6, 2011) (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, resolve conflicts of evidence, *Hays*, 907 F.2d at 1456, and provide good reasons in the written decision for the weight given to the opinions. 20 C.F.R. § 404.1527(e)(2)(ii).

In the instant case, the ALJ accorded "little weight" to the RFC opinion of Dr. Cox on the ground that "his findings are disproportionate with the longitudinal records and the claimant's activities of daily living." (Tr. at 30). The ALJ also rejected Dr. DiCristafaro's opinion of disability "as this [is] a finding reserved to the Commissioner," and accorded "less than considerable weight" to Dr. DiCristafaro's opinion regarding Claimant's limitations, "as the limitations propounded are inconsistent and disproportionate to the claimant's activities of daily living." (*Id.*). The ALJ noted that both state agency evaluators, Dr. Lim and Dr. Franyutti, opined that Claimant "would be limited to the light exertional level of work with additional postural and environmental limitations" and "afford[ed] these State agency examiner opinions great weight, but [found] the record supports the claimant is limited" consistent with his RFC determination. (Tr. at 31). The ALJ did not offer any further elaboration as to his rationale for giving great weight to the State examiner opinions and little weight to Dr. Cox and Dr. DiCristafaro's opinion, nor did he weigh or discuss the opinion of physical therapist Doug James. (Tr. at 29-31). After carefully reviewing the administrative record, the undersigned finds that the ALJ's decision warrants remand, for failure to adequately discuss and weigh all of the relevant opinions.

First, as Claimant notes, the ALJ accorded little weight to the RFC opinions of Claimant's treating physicians, Dr. Cox and Dr. DiCristafaro, and completely failed to address or weigh the RFC opinion of examining physical therapist Doug James.[2] (Tr. at 29-31).

The Regulations distinguish between "acceptable medical sources," and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include licensed physicians (medical or osteopathic doctors), licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists, whereas "other sources" include other medical sources that are not considered "acceptable medical sources," e.g. "nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists," as well as educational personnel, public and private social welfare agency personnel, and other non-medical sources. *Id.* at § 404.1513(a),(d). Although physical therapists are not considered "acceptable medical sources," *see Yost v. Barnhart*, 79 F. App'x 553, 555 (4th Cir. 2003), the SSA makes clear that opinions from medical sources who are not technically deemed "acceptable medical sources" are nevertheless "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p, 2006 WL 2329939, at *3 (S.S.A. 2006). The SSA instructs that the factors used to evaluate acceptable medical source opinions "represent basic principles that apply to the consideration of all opinions from medical sources who are not 'acceptable medical sources.'" *Id.* at *4 (citing 20 C.F.R. § 404.1527(d)).

---

[2] Claimant refers to Mr. James as her "treating physical therapist." (ECF No. 13 at 7). However, it appears that Mr. James provided a one-time evaluation of Claimant's functional capacity pursuant to a referral from her treating physician, Dr. Cox. (Tr. at 368-70, 374). Although Claimant received physical therapy from Teays Physical Therapy Center, Mr. James' place of employment, her physical therapy was discontinued in January 2010, four months prior to Mr. James' evaluation. (Tr. at 399). On remand, the ALJ may wish to clarify whether Mr. James constitutes a treating source for the purpose of weighing his RFC opinion.

Based upon an in-person examination on April 7, 2010, Mr. James found that Claimant "demonstrated impaired right knee range of motion and strength," "had a moderate knee joint effusion" and "demonstrated an antalgic right limp that worsened as the test progressed." (Tr. at 368). Significantly, Claimant "asked to sit to rest due to knee pain after 23 minutes on her feet," with pre-evaluation pain rating at 3/10 and post-evaluation pain rating at 8/10. (*Id.*). Claimant failed the "30 second single leg standing balance test," required "heavy reliance on two handrails" to ascend and descend 4 steps, completed 1 minute of a maximum 5-minute sustained kneel test before stopping due to increased right knee pain, and was unable to squat to greater than 20 degrees of right knee flexion. (Tr. at 371). These findings corroborate the RFC opinions of Claimant's treating physicians, and contradict the ALJ's determination that Claimant could "stand and work for approximately 6 hours per eight-hour work day" as required to perform the full range of "light work." *See* SSR 83-10, 1983 WL 31251, at *5-6 (S.S.A. 1983). Mr. James' evaluation particularly undercuts the ALJ's determination that Dr. Cox's findings were "disproportionate with the longitudinal records," at least with respect to Claimant's knee-related limitations, as Mr. James was specifically referred by Dr. Cox to evaluate Claimant's functional capacity, (Tr. at 368-71), and his opinion informed Dr. Cox's recommendation that Claimant required more sedentary work. (Tr. at 365-66).

Although the ALJ noted that Claimant "had a functional capacity evaluation," he did not address or assign weight to the findings contained in Mr. James' opinion anywhere in his decision. (Tr. at 29). Accordingly, there is no way to tell if he intended to discount the physical therapist's RFC opinion, or if he simply ignored it. As the Fourth Circuit has explained,

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his

> decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *Stewart v. Apfel*, No. 98-1785, 1999 WL 485862, at *3 (4th Cir. 1999). Thus, "[b]ecause the ALJ did not explicitly indicate the weight given to all of the relevant evidence, [the Court] cannot determine if the findings are supported by substantial evidence," thereby warranting remand. *Slayton v. Apfel*, No. 98-1885, 1999 WL 152614, at *3 (4th Cir. 1999) (quoting *Gordon*, 725 F.2d at 235.

Second, although the ALJ noted that Claimant had "full range of motion of the right knee" and that "her knee was stable" in December 2010, he failed to mention or otherwise acknowledge that these findings were made in the context of a pre-operative examination in preparation for Claimant's third knee surgery in under two years. (Tr. at 523-24). This constitutes a significant mischaracterization of the condition of Claimant's right knee, as her December 21, 2010 unicompartmental arthroplasty revealed "Grade IV chondromalacia medial tibial plateau and weightbearing dome of the medial femoral condyle, rimming ostephytes of the distal femur, and varus alignment of the right knee." (Tr. at 499-501). While an ALJ is not required to discuss every piece of evidence in the record, *see Fischer v. Barnhart*, 129 Fed.App'x 297, 303 (7th Cir. 2005); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998), he "may not select and discuss only that evidence that favors his ultimate conclusion." *Hines v. Barnhart*, 453 F.3d 559, 566 (4th Cir. 2006) (quoting *Diaz*, 55 F.3d at 307).

The ALJ's failure to note Claimant's partial knee replacement is particularly significant because the operation and findings undermine the state agency RFC opinions, to which the ALJ afforded "great weight." In his October 22, 2010 RFC opinion, state

consultative evaluator Dr. Lim stated that Claimant's allegations were "not supported by medical evidence," noting that Claimant alleged "knee pain due to mild DJD on xray and possible tear of meniscus but no surgery done, no knee replacement." (Tr. at 472). Given that Dr. Lim found the absence of surgery to be a significant factor in forming his opinion, the occurrence of Claimant's right partial knee replacement a mere two months later, and the detailed post-operative findings, which displayed more than "mild" DJD significantly diminish the validity of his opinion. The ALJ had this information available to him, yet failed to reconcile the surgery and post-operative findings with Dr. Lim's opinion. Similarly, in his February 1, 2011 RFC opinion, Dr. Franyutti noted "new allegations" of increased left knee pain, ulcers, and a hiatal hernia, but apparently did not review Claimant's right partial knee replacement records, or the two available medical source statements (Cox, James) regarding her physical capacities. (Tr. at 572-73).

Although Claimant's December 2010 arthroplasty occurred three months after her date last insured, when it is viewed in conjunction with the remainder of the record, one can infer that Claimant's right knee was in a state of progressive deterioration throughout the relevant time period. (Tr. at 280, 283, 304-05, 381, 366, 437). The ALJ never addressed Claimant's partial knee replacement, nor discussed how or if the surgery was pertinent to the time frame at issue and to Claimant's ability to work prior to the date last insured. In contrast, when considering that Dr. Cox initially raised the need for a partial knee replacement in March 2010, the longitudinal record certainly seems to make that factual connection. (Tr. at 374).[3]

To summarize, the ALJ afforded "great weight" to the opinions of Dr. Lim and Dr. Franyutti, generally, but failed to provide any rationale for such weight. Similarly, the

---

[3] The record documents a discussion between Claimant and Dr. Cox during which he advised Claimant that her definitive treatment was going to be "a resurfacing procedure such as a [*sic*] Oxford medial unicompartmental arthroplasty versus potentially a high tibial osteotomy,"

ALJ summarily rejected the treating physicians' opinions as being inconsistent with the longitudinal records and Claimant's ADL's, without further explanation. Moreover, the ALJ failed to address Claimant's right knee arthroplasty and accompanying findings, despite the fact that they tend to weigh against the ALJ's determination that Claimant could stand/walk for a total of about 6 hours, and in favor of Claimant's treating source opinions that she requires more sedentary work. Therefore, remand is appropriate because "ALJ fail[ed] to discuss relevant evidence that weighs against his decision." *Ivey v. Barnhart*, 393 F.Supp.2d 387, 390 (E.D.N.C. 2005).

### *2. Assessment of Claimant's Credibility*

Claimant argues that the ALJ's erred in assessing the credibility of her testimony and statements, and insists that the ALJ's credibility determination is "without merit in light of the treating source medical evidence contained in the record." (ECF No. 13 at 7).

Pursuant to the Regulations, the ALJ evaluates a claimant's report of symptoms using a two-step method. 20 C.F.R. § 404.1529. First, the ALJ must determine whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* § 404.1529(a). That is, a claimant's "statements about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. 1996). Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 404.1529(a). If the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7p, 1996 WL 374186, at *2. In evaluating a claimant's credibility regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources. 20 C.F.R. § 404.1529(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques. *Id.* § 404.1529(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* § 404.1529(c)(3); *see also Craig v. Cather*, 76 F.3d 585, 595 (4th Cir. 1996); SSA 96-7P, 1996 WL 374186, at *4-5. In *Hines v. Barnhart*, the Fourth Circuit Court of Appeals stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 96-7p, 1996 WL 374186, at *6.

Social Security Ruling 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations. . . for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p, 1996 WL 374186, at *4.

When considering whether an ALJ's credibility determinations are supported by substantial evidence, the Court does not replace its own credibility assessments for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court

does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

In the instant case, the ALJ provided an overview of Claimant's testimony at the administrative hearing, (Tr. at 26-27), which he then compared to certain medical evidence and consultative evaluations, in order to assess Claimant's credibility. (Tr. at 27-30). The ALJ found that Claimant's impairments could reasonably be expected to cause the symptoms she alleged, but that Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were only partially credible. (Tr. at 27-28). The ALJ determined that Claimant's allegations of "fibromyalgia, degenerative joint disease in knees, osteoarthritis, and COPD" were "not fully supported as debilitating by the record, and fail to establish a finding of disability for the purpose of Social Security." (Tr. at 28). The ALJ further indicated that considering her ADL's, which included "caring for her ailing mother, performing household chores, cooking, driving, maintaining her hygiene and grooming needs, paying bills, watching television, shopping for groceries, going out to eat, attending church, and playing with her grandchildren," there was "no reason why she could not function equally as well in a competitive work environment if she were motivated to do so." (Tr. at 30).

However, as discussed above, the ALJ's review of the relevant medical evidence was deficient in that he ignored two significant sets of medical records, namely physical therapist Doug James's RFC examination and opinion, and the treatment notes relating to Claimant's December 2010 arthroplasty, both of which are consistent with Claimant's

testimony and statements regarding the intensity, persistence, and limitations of her impairments. Thus, although the ALJ followed the proper two-step procedure in assessing Claimant's credibility, his failure to appropriately weigh the corroborating medical records warrants reevaluation of Claimant's credibility.

Consequently, the undersigned **FINDS** that the ALJ's decision committed reversible error in failing to address relevant evidence conflicting with his RFC opinion, and therefore **REMANDS** this case for further proceedings consistent with this order.

### B. Application of the Grid Rules

The Medical-Vocational Guidelines (the "Grids") "contain numbered table rules which direct conclusions of 'Disabled' or "Not disabled' where all of the individual findings coincide with those of a numbered rule." SSR 83-12, 1983 WL 31253, at *1 (S.S.A. 1983); *see* 20 C.F.R. Pt. 404, Subpart P, Appendix 2. The Grids are intended to be utilized at the fifth step of the sequential process, for "cases which cannot be evaluated on medical considerations alone, where an individual with a severe medically determinable physical or mental impairment(s) is not engaging in substantial gainful activity and the individual's impairment(s) prevents the performance of his or her vocationally relevant past work." 20 C.F.R. Pt. 404, Subpt. P, App'x 2 § 200.00. Thus, in determining whether there are jobs that exist in significant numbers in the national economy, the Commissioner may rely upon the Grids "which take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age, education, previous work experience, and residual functional capacity." *Grant v. Schweiker,* 699 F.2d 189, 191–192 (4th Cir. 1983); s*ee also* 20 C.F.R. § 404.1569. The Grids categorize jobs by their physical-exertion requirements; accordingly "[a]t step 5 of the sequential evaluation process, RFC must be expressed in terms of, or

related to, the exertional categories when the adjudicator determines whether there is other work the individual can do." SSR 96-8p, 1996 WL 374184, at *3. However, because the Grids consider only the exertional component of a claimant's disability, 20 C.F.R. § 404.1569, when a claimant has significant nonexertional impairments or has a combination of exertional and nonexertional impairments, the Grids merely provide a framework to the ALJ, who must give "full individualized consideration" to the relevant facts of the claim in order to establish the existence of available jobs. *Id.*

The ALJ must consult the Grids to determine whether a rule directs a finding of disability based on the strength requirement alone. If so, there is no need to assess the effects of nonexertional limitations. However, if the Grids direct a finding of "not disabled" based on the strength requirement alone, then the ALJ cannot rely on the finding and, instead, must establish the availability of jobs through the testimony of a vocational expert. *Walker v. Bowen*, 889 F.2d 47, 49-50 (4th Cir. 1989). Because the analysis subtly shifts at this step from an assessment of the claimant's limitations and capabilities to the identification of the claimant's potential occupational base, matching the appropriate exertional level to the claimant's RFC is the starting point. As the RFC is intended to reflect the **most** the claimant can do, rather than the least, the ALJ expresses the RFC in terms of the highest level of exertional work that the claimant is generally capable of performing, but which is "insufficient to allow substantial performance of work at greater exertional levels." SSR 83-10, 1983 WL 31251, at *4. From there, the ALJ must determine whether the claimant's RFC permits her to perform the full range of work contemplated by the relevant exertional level. *Id.* at *3-4. "[I]n order for an individual to do a full range of work at a given exertional level ... the individual must be able to perform substantially all of the exertional and nonexertional functions required in work at that

level." *Id.* at *3. If the claimant's combined exertional and nonexertional impairments allow her to perform many of the occupations classified at a particular exertional level, but not all of them, the occupational base at that exertional level will be reduced to the extent that the claimant's restrictions and limitations prevent her from doing the full range of work contemplated by the exertional level. *Id.*

Here, Claimant argues that her medical impairments limit her to sedentary work, thereby qualifying her as disabled under Grid Rule 201.14. (ECF No. 13 at 11). Rule 201.14 directs a finding of "disabled" for individuals limited to sedentary work who are (1) closely approaching advanced age, (2) have a high school education or more, which does not provide for direct entry into skilled work, and (3) have previous work experience which is skilled or semiskilled, where the skills are not transferable. 20 C.F.R. Pt. 404, Subpart P, Appendix 2 § 201.14. In contrast, Grid Rule 202.14 directs a finding of "not disabled" for individuals who possess identical age, education, and prior work experience, but are capable of performing light work. *Id.* § 202.14.

Under the regulations, "sedentary work" is defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 1567(a). Furthermore, "[a]lthough a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id.* In contrast, "light work" is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered

capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." *Id.* § 1567(b). The SSA explains that:

> The major difference between sedentary and light work is that most light jobs--particularly those at the unskilled level of complexity--require a person to be standing or walking most of the workday. Another important difference is that the frequent lifting or carrying of objects weighing up to 10 pounds (which is required for the full range of light work) implies that the worker is able to do occasional bending of the stooping type; i.e., for no more than one-third of the workday to bend the body downward and forward by bending the spine at the waist.

SSR 83-14, 1983 WL 31254, at *4 (S.S.A. 1983).

The ALJ determined that Claimant was capable of performing light exertional work with additional non-exertional limitations. (Tr. at 25-31). The ALJ observed that "if the claimant had the RFC to perform the full range of light work, a finding of 'not disabled' would be directed by Medical-Vocational Rule 202.13." (Tr. at 32). Due to Claimant's additional functional limitations, the ALJ relied upon the vocational expert's testimony to determine that there existed jobs in significant numbers in the national economy that Claimant could perform, and was therefore not disabled. (Tr. at 31-32). However, as discussed above, the ALJ's RFC assessment is deficient for failure to address certain relevant medical evidence relating to Claimant's knee impairments and corresponding functional limitations. Having found that the ALJ's decision warrants remand to re-evaluate Claimant's RFC in light of these records, it follows that the ALJ will subsequently reconsider whether Claimant qualifies as "disabled" under the Grid rules, or alternatively whether Claimant can perform jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520(g).

### C. New Evidence Provided to the Appeals Council

The Court may remand the Commissioner's decision for a rehearing under sentence four of 42 U.S.C. § 405(g). A sentence four remand, or a reversal of the

Commissioner's decision, is appropriate when the Commissioner's decision is not supported by substantial evidence, the Commissioner incorrectly applied the law when reaching the decision, or the basis of the Commissioner's decision is indiscernible. *See Hays*, 907 F.2d at 1456; *see also Brown v. Astrue*, Case No. 8:11–03151–RBH–JDA, 2013 WL 625599 (D.S.C. Jan. 31, 2013) (citations omitted); Under sentence four, the Court has the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The regulations require that if new and material evidence is submitted after the ALJ's decision and while a request for review is pending, the Appeals Council:

> shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R 404.970(b). If a claimant "submit[s] evidence which does not relate to the period on or before the date of the administrative law judge hearing decision, the Appeals Council will return the additional evidence [to the claimant] with an explanation as to which it did not accept the additional evidence." 20 C.F.R. § 404.976(b). Thus, in order for the Appeals Council to incorporate additional evidence into the administrative record, it must be (a) new, (b) material, and (c) relate[] to the period on or before the date of the ALJ's decision." *Wilkins v. Secretary, Dep't of Health and Human Servs*, 953 F.2d 93, 95-96 (4th Cir. 1991) (quoting *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990)). Evidence is considered new "if it is not duplicative or cumulative," and is considered material "if there is a reasonable possibility that the new evidence would have changed

the outcome." *Id.* at 96.

When the Appeals Council incorporates new and material evidence into the administrative record, but nevertheless denies review of the ALJ's findings and conclusions, the issue before the Court is whether the Commissioner's decision is supported by substantial evidence in light of "the record as a whole including any new evidence that the Appeals Council specifically incorporated into the administrative record." *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011) (quoting *Wilkins* 953 F.2d at 96)) (internal marks omitted). If the ALJ's decision is flawed for any of the reasons stated, the Court may reverse and/or remand the matter for a rehearing under sentence four.[4] In contrast, when the Appeals Council fails to incorporate new and material evidence related to the relevant time period, this constitutes reversible error, even if the Commissioner's decision might still be supported by substantial evidence. *See Davis v. Sullivan*, No. 89-2488, 1990 WL 85355, at *2 (4th Cir. 1990) ("Although prepared after the ALJ's decision, [the new evidence] pertains to appellant's pre-decision physical condition. Consequently, it constitutes new and material evidence of appellant's disability.").

In the instant case, Claimant provided additional evidence while her request for review by the Appeals Council was pending. This included (1) medical treatment notes from Dr. Olajide dated October 31, 2011, and (2) a consultative RFC opinion and accompanying letter from Dr. Craig for the "time period of 3-23-2009 through 9-30-2010," which was dated October 21, 2011. (Tr. at 7-17). The Appeals Council reviewed the new evidence, but declined to incorporate it into the administrative record on the ground that the "new information is about a later time" than September 30, 2010, and therefore "does not affect the decision about whether [Claimant] was disabled at the time [she was]

---

[4] Sentence four allows the court to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

last insured for disability benefits." (Tr. at 1-2). The undersigned addresses both records independently.

First, Dr. Olajide's October 31, 2011 treatment notes post-date the ALJ's decision by one month, and post-date her date last insured for disability benefits by a year and one month. (Tr. at 8). These records contain subjective complaints by Claimant of neck pain experienced over the past three weeks, a physical examination and assessment of Claimant's current condition, and instructions going forward. There is no indication that Dr. Olajide's records were intended to relate back to the relevant time period. (Tr. at 8-10). Accordingly, the Appeals Council did not err in declining to incorporate Dr. Olajide's October 31, 2011 treatment notes into the record.

Second, on October 21, 2011, Dr. Craig provided an RFC opinion of Claimant pursuant to her attorney's request. (Tr. at 14-17). Although the opinion post-dates the ALJ's decision by one month, it explicitly purports to cover the "time period of 3/23/2009 through 9/30/2010." (Tr. at 15). Accordingly, it "relate[s] to the period on or before the date of the administrative law judge hearing decision." *See* 20 C.F.R. § 404.976(b). Despite relating to the requisite time frame, the Commissioner argues that Dr. Craig's opinion is neither new nor material because it "does not reveal any additional limitations imposed by Plaintiff's physical impairments that were not previously considered by the ALJ when he formulated his restrictive RFC assessment." (ECF No. 14 at 19-20). However, "[b]ecause the Court holds that remand is necessary and remand will require that the Commissioner re-weigh the evidence, it is unnecessary to decide whether the evidence presented, for the first time, to the Appeals Council required that it review the ALJ's decision as contrary to the weight of the evidence." *Young v. Barnhart*, 284 F.Supp.2d 343, 353-54 (W.D.N.C. 2003). On remand, the Commissioner should consider

Dr. Craig's RFC opinion, as it "appears relevant, it appears to relate to the time period at issue in this case, and it was presented to the Appeals Council before its final decision." *Id.* at 354.

## VIII.  <u>Conclusion</u>

After careful consideration of the evidence of record, the Court finds that the Commissioner's decision is based upon an incorrect application of the law. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **REVERSED** and this matter is **REMANDED** for further proceedings consistent with this opinion.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:** February 12, 2014.

_____
Cheryl A. Eifert
United States Magistrate Judge